IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOSHUA REOLA**, <br><br>　　　　Plaintiff. <br><br> v. <br><br> **COLONIAL PENN LIFE INSURANCE COMPANY**, <br><br>　　　　Defendant. | Civil Action No. _____ <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW Plaintiff Joshua Reola, and through his counsel of record, submits his Complaint against Defendant Colonial Penn Life Insurance Company, and states:

### INTRODUCTION AND BACKGROUND ON THE TCPA

1. Plaintiff Joshua Reola ("Plaintiff" or "Reola") brings this case to protect his privacy rights, namely the right to be left alone from unwanted and incessant telemarketing phone calls.

2. Reola brings this suit to get telemarketers like Defendant Colonial Penn Life Insurance Company ("Defendant"), to stop incessantly calling his phone despite the fact Reola (1) received prerecorded and/or artificial voice calls (also referred to as "robocalls") from or on behalf of Defendant despite not providing any form of permission or consent to receive such calls; and, (2) registered his phone numbers on the National Do-Not-Call Registry ("DNC List").

3. As detailed in this Complaint, Reola has received hundreds of unwanted telemarketing calls from or on behalf of Defendant.

4. These telemarketing calls are cold calls. Cold calls, or calls without any consent, have extremely low conversion rates, often under 2%. This means that for every 100 calls made, a telemarketer can expect to have a conversation with 1-2 individuals. Knowing the conversion rates

are so poor, and that manually dialing 100 calls to engage with only 1-2 individuals is both time consuming and expensive, telemarketers like Defendant, have developed sophisticated calling campaigns that rely on artificial intelligence to interact with individuals that engage during the unwanted, unsolicited calls placed to them.

5. Telemarketers, like Defendant, employ an artificial voice or bot to engage with the individuals in the first instance. The use of an artificial voice or bot allows telemarketers like Defendant to place calls *en masse* and weed out those individuals that are not interested or quickly terminate the calls (because they are not interested) and identify the 1-2% of called parties that will engage with the caller. Those that engage are then transferred to a "screener" or "fronter" that ensures the caller fits whatever sales criteria the telemarketer has set before transferring the call to a "closer", in this case a licensed insurance agent that can actually sell an insurance product.

6. To be profitable, this scheme requires millions of unwanted, unsolicited, telemarketing calls to be placed to consumers.

7. Reola brings this case to address this problem. These unwanted, unsolicited cold calls often involve, as in this case, the incessant and unsolicited sale of insurance products, including "final expense insurance."

8. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the Telephone Consumer Protection Act ("TCPA") into law, to protect consumers' consumers' privacy rights, namely, the right to be left alone from unwanted telemarketing calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

9. The TCPA provides protections from people receiving prerecorded or artificial voice calls, which are commonly referred to as robocalls and are referred to as robocalls throughout

this Complaint. Specifically, the TCPA provides that each person who receives a prerecorded or artificial voice call in violation of the TCPA is entitled to recover a penalty of $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. *See* 47 U.S.C. § 227(b)(1)(A); 47 C.F.R. § 64.1200(a).

10. The TCPA also affords special protections for people who registered their phone numbers on the National Do Not Call Registry. Specifically, the TCPA provides that each person who receives more than one call on their phone after being registered on the National Do Not Call Registry is entitled to recover a penalty of $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

11. Since 2003, persons who register their cell phone numbers on the DNC List are considered to be "residential subscribers" for the purpose of 227(c)(5) and the DNC List. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003) ("we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'")

12. Highlighting the problems of incessant robocalls, in 2025 alone, approximately 52.5 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited Jan. 7, 2026).

13. Decades after the TCPA was passed into law, it is still unfortunately the case that "month after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

14. The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications

Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

**JURISDICTION AND VENUE**

15. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States.

16. This Court has personal jurisdiction over Defendant because Defendant is headquartered in Philadelphia, Pennsylvania, transacts business in Pennsylvania, places telemarketing phone calls to persons in Pennsylvania and for the reasons otherwise set forth in this Complaint.

17. Reola experienced the annoyance, frustration, and disruption from Defendant's telemarketing calls that originated from this District.

18. Furthermore, Defendant is headquartered in this District.

19. Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), as Defendant is headquartered in this District and a substantial portion of the events giving rise to the claim arose in this District.

**PARTIES**

20. Reola is an individual who at all times material to this Complaint resided in and was a citizen of San Francisco, California.

21. Reola is the owner of a cell phone. His cell phone number is 512-XXX-0880.

22. Reola registered his phone number on the DNC List on or about January 15, 2008, to obtain solitude from unwanted telemarketing calls.

23. Reola's cell phone number is a personal phone number and is not a business line.

24. The monthly bill associated with Reola's phone number is issued in Reola's name, and not in the name of a business.

25. Reola uses his cell phone primarily for residential purposes, such as communicating with friends and family members.

26. Reola was and is a frequent recipient of hundreds if not thousands of unwanted telemarketing calls, including prerecorded and/or artificial voice robocalls.

27. The receipt of this voluminous amount of calls caused Reola significant harassment, an invasion of his privacy, to waste his time addressing the calls, and to be significantly annoyed and perturbed.

28. Reola registered his number on the national Do-Not-Call registry, but that did not prevent him from receiving continuing illegal telemarketing calls.

29. Reola would also ask telemarketers not to call him and to be added to their do-not-call lists, but that did not prevent him from receiving continuing illegal telemarketing calls.

30. Reola would also interact with these telemarketers to be transferred to their screeners, fronters and/or closers, and ask the live human beings to stop calling him and add him to their do not call lists. Unfortunately, even this did not prevent him from receiving continuing illegal telemarketing calls.

31. To attempt to address this problem and avoid continuing illegal telemarketing calls, Reola developed a solution that would help him save the significant amount of time he had to

spend answering, interacting with an artificial voice or a bot to identify the actual caller, and addressing these incessant and unwanted calls, although he would still be bothered by the incessant ringing of his phone.

32. Reola developed a system by which after his phone number would ring multiple times from an unknown number, an A.I. receptionist would appear on the line and speak with the caller to attempt to determine who was calling and attempt to "weed out" illegal robocalls.

33. The A.I. receptionist could speak with the persons or representatives calling, ask questions and obtain information from the callers.

34. The A.I. receptionist acted on Reola's behalf in speaking with said persons and/or representatives.

35. The ringing of Reola's phone and the time Reola spent reviewing the AI notes caused disruption and wasted Reola's time- albeit slightly less than if he answered and spoke with the callers himself.

36. Defendant is a Pennsylvania Domestic Business Corporation with its headquarters in Philadelphia, Pennsylvania.

37. Defendant has been in good standing to transact business throughout the United States, including in Pennsylvania, at all times relevant to this Complaint.

38. Defendant's website domain name is www.colonialpenn.com ("Defendant's website").

39. Defendant's website states that it "is a Philadelphia-based life insurance company . . . ."

40. Defendant's website states that Defendant specializes "in offering life insurance directly to consumers. Through . . . our call center . . . we focus on providing life insurance

6

protection for folks like you and your loved ones."

41. Defendant's website advertises its life insurance products and provides consumers the option on its website to get life insurance quotes from all 50 states.

42. Defendant's website states in relation to life insurance, "[t]he money your beneficiaries will receive from your life insurance policy after your death is called a death benefit."

43. Defendant's website further states that a "death benefit" can be used to "pay funeral costs and other final expenses."

44. Defendant's website states that it "specialize[s] in call centers" and that it believes "the best way to improve your profitability and grow your business is with more effective contact with customers and prospects."

45. Defendant's website states it offers "telemarketing services." Defendant's website states that these services are ideal for "direct sales" and "lead generation and qualification."

46. Defendant's website also contains a page titled, "Final Expense Life Insurance."

47. The "Final Expense Life Insurance" page states, "Why Final Expense Insurance? This guaranteed acceptance coverage can help you loved ones pay for funeral costs and other final expenses, so they aren't left with a financial burden after you pass."

48. Defendant's website also contains a page titled, "What Is Burial & Funeral Expense Insurance?"

49. The "Burial & Funeral Expense Insurance" page states that there are multiple benefits to this insurance including helping "pay for the funeral and burial or cremation."

50. Upon information and belief, Defendant attempts to sell its insurance products via unsolicited telemarketing calls or cold calls.

51. Upon information and belief, Defendant has designed a telemarketing system

where it can place an extraordinary number of calls using an artificial voice or bot to screen for individuals that will engage with Defendant's sales pitch. Once the artificial voice or bot captures certain information, Defendant's telemarketing system will transfer the call to a live screener that confirms the information collected meets Defendant's criteria and then transfers the call to a live "closer" that will then attempt to sell the individual one of Defendant's products or services.

### DEFENDANT'S INCESSANT TELEMARKETING CALLS TO REOLA

52. On May 21, 2025, Reola received a call on his cell phone from or on behalf of Defendant. Reola's phone rang multiple times, and the call was from an unrecognized number.

53. Reola then answered the call utilizing his A.I. receptionist.

54. The caller utilized an artificial or prerecorded voice and stated, "Hi. This is Cynthia Davis. You asked me to call you back. Do you remember?" The caller then said they were with "U.S. Funeral Expenses" and began speaking about a "state regulated final expense insurance plan that's going to cover 100 percent of your funeral, burial and cremation expense."

55. Neither Reola nor his A.I. receptionist ever asked to be called back. Rather, this was a prerecorded script.

56. Upon information and belief, Defendant and its telemarketers use such scripts to confuse or suggest to the called party that the call was legitimate and in response to a request when none was ever made.

57. Upon information and belief, Defendant and its telemarketers use fictitious names, like U.S. Funeral Expenses, to avoid their illegal calls from being associated with Defendant and to avoid public complaints about the calls. Because these are cold calls, and calls made to individuals on the National Do-Not-Call registry, Defendant avoids using its real name so that consumers that receive the calls do not immediately associate the calls with Defendant and do not

make complaints about Defendant's illegal activity. Instead, consumers will complain about calls from "U.S. Funeral Expenses" or the fictitious names Defendant uses on the calls.

58. The caller then asked age-related questions and the call got disconnected.

59. On May 22, 2025, Reola received a call on his cell phone from or on behalf of Defendant. Reola's phone rang multiple times, and the call was from an unrecognized number.

60. Reola then answered the call utilizing his A.I. receptionist.

61. The caller utilized an artificial or prerecorded voice and stated, "Hello. This is Hannah, and you asked me to call you back. Do you remember? I'm with U.S. Funeral Expenses and based on our records, it shows that you may qualify for a state regulated final expense insurance plan that's going to cover 100 percent of your funeral and cremation expense."

62. Neither Reola nor his A.I. receptionist ever asked to be called back. Rather, this was a prerecorded script.

63. The caller then began to ask age and health-related questions and advised that they received Reola's phone number from "a local database."

64. The caller then transferred the call over to a "supervisor."

65. Upon information and belief, the "supervisor" is Defendant's live "screener" or "fronter" that ensures the information provided meets certain criteria before passing the call onto one of Defendant's licensed representatives that can actually sell insurance products.

66. The transfer was placed to a live representative who stated the call was about a "final expense policy" which was "designed to cover one hundred percent of your funeral and burial expenses."

67. After answering additional questions, the call was transferred to another live representative.

68. Upon information and belief, this representative was Defendant's "closer" or licensed insurance agent.

69. The second representative stated he was calling from "Final Expense Company" and was working with carriers such as "Colonial Penn" and again confirmed that the insurance would cover one hundred percent of funeral expenses.

70. The A.I. receptionist asked the caller to place the phone number on the do-not-call list, and the caller agreed to do so.

71. On information and belief, the caller utilized an artificial and/or prerecorded voice because the cadence and response time in the caller's voice was unnatural.

72. On June 11, 2025, Reola received a call on his cell phone from or on behalf of Defendant. Reola's phone rang multiple times, and the call was from an unrecognized number.

73. Reola then answered the call utilizing his A.I. receptionist.

74. The caller stated, "Hi. This is Hannah Walker. I'm with U.S. Funeral Expenses. How are you doing today?"

75. The caller then discussed a "final expense insurance plan that's going to cover 100 percent of your funeral, burial and cremation expense" and began asking age and health-related questions.

76. The caller then transferred the call to a live representative who stated they were calling about "whole life insurance" that "covers your funeral, burial and cremation" and other expenses associated with a person's passing.

77. Upon information and belief, this representative was Defendant's live "screener" or "fronter."

78. The caller then stated that he was working with companies such as "Colonial Penn" and asked a series of questions related to qualifying for the insurance that related to age and health.

79. After answering additional questions, the call was transferred to another live representative. The call got disconnected, and the caller immediately called Reola back.

80. Upon information and belief, the caller was one of Defendant's "closers" or a licensed insurance agent that could sell Defendant's products or services.

81. The caller stated that they were "working in partnership with Colonial Penn" and that "the reason of my call is to make sure your family has the protection they need when something like death happens in your family, such as a final expense."

82. The caller then asked a series of question related to the insurance being sold such as whether he wanted to be buried or cremated.

83. The caller then stated, "I want to make sure that I tell you Colonial Penn offers you guaranteed acceptance whole life." The caller also asked, "Do you have any other life insurance policy with any other company besides Colonial Penn?"

84. The caller later stated, "Let me see how much Colonial Penn guarantees you at" and then advised that "Colonial Penn" would provide over $10,000 in coverage.

85. After providing this information, the caller stated she was "a licensed agent with Colonial Penn Life Insurance Company." The caller provided a direct call back number of 855-407-5032 and "Colonial Penn's customer service number" which was an 800 number.

86. Upon information and belief, Defendant's insurance agents are aware of this telemarketing scheme.

87. Upon information and belief, Defendant's insurance agents are in a call center environment (either remotely or physically in an office) and take repeated calls after the calls have been pre-screened by Defendant's artificial voice system or bots and live screeners.

88. Upon information and belief, Defendant's insurance agents or "closers" are provided with the qualifying information obtained by the artificial voice system or bots and live screeners via email or via a software program that displays the information collected.

89. On July 4, 2025, Reola received a call on his cell phone from or on behalf of Defendant. Reola's phone rang multiple times, and the call was from an unrecognized number.

90. Reola then answered the call utilizing his A.I. receptionist.

91. The caller stated that they were calling about a "final expense insurance plan that's going to cover 100 percent of your funeral, burial and cremation expenses." The caller then began asking age and health-related questions.

92. The caller then transferred the call to another representative.

93. The second representative advised that he would assist with "final expense" coverage. The representative then described the final expense coverage and asked a series of questions concerning the proposed coverage, including age and health-related questions.

94. The representative then transferred the call to a third representative who also began discussing "final expense" insurance.

95. The representative then mentioned being affiliated with "Colonial Penn."

96. The representative then asked a series of health-related questions.

97. The A.I. receptionist then advised the caller to add Reola's phone number to its do not call list and to not call him again.

98. On August 5, 2025, Reola received a call on his cell phone from or on behalf of Defendant. Reola's phone rang multiple times, and the call was from an unrecognized number.

99. The caller stated they were calling from "U.S. Funeral Expenses" and the purpose of the call was to provide a "solution" to "make sure [your] loved ones won't be burdened with unexpected expenses."

100. The caller then began discussing a variety of insurance plans that were available.

101. The caller then transferred the call to a second representative.

102. The second representative stated that he was with the "final expense" department. The representative then stated he was "working with Colonial Penn."

103. On August 22, 2025, Reola received a call on his cell phone from or on behalf of Defendant. Reola's phone rang multiple times, and the call was from an unrecognized number.

104. The caller stated that "the state has recently approved a new final expense whole life insurance" and that it would "cover 100 hundred percent of your funeral, burial and cremation expenses."

105. The caller then asked an age-related question and transferred the call to another representative.

106. The second representative stated that they were with "senior benefits" and that the call concerned "final expense life insurance" that covers "funeral and burial expenses."

107. The representative then began asking health and age-related questions.

108. The A.I. receptionist asked if the caller was with Colonial Penn. The caller responded, "we are working with them."

109. On September 18, 2025, Reola received a call on his cell phone from or on behalf of Defendant. Reola's phone rang multiple times, and the call was from an unrecognized number.

13

110. Reola then answered the call utilizing his A.I. receptionist.

111. The caller stated that they were calling regarding "final expense insurance coverage" and stated that they were representing "Colonial Penn" and other companies.

112. The A.I. receptionist then advised the caller to add Reola's phone number to its do not call list and to not call him again.

113. In addition to the calls above, Reola received at least an additional 637 calls from or on behalf of Defendant through January 12, 2026. These calls followed the same or similar scripts as identified above, followed the same transfer protocols detailed above, and/or included the same phrases "U.S. Funeral Expenses," "state regulated" or reference to the policy covering "100 percent" of funeral, burial and cremation expenses.

114. Of these calls 351 utilized a prerecorded and/or artificial voice, and 286 were live calls.

115. Prior to the receipt of each of these calls, Reola's phone audibly rang multiple times.

116. As to each of the calls, Reola selected the A.I. receptionist to answer the call after his phone rang multiple times.

117. As to each of the prerecorded voice calls, Reola could tell the calls utilized prerecorded and/or artificial voices because of the scripted nature of the call, the unnatural cadence of the responses, and/or the unnatural pauses in the conversation.

118. Prior to receiving these calls, Reola did not provide prior express written consent or any form of consent to Defendant or anyone acting on his behalf to call his phone.

119. Reola not provide his phone number to Defendant or anyone acting on its behalf.

120. Reola had no prior business relationship with Defendant before receiving the calls

at issue.

121. Reola never inquired of Defendant about any of its insurance products or services, or any of Defendant's products or services before he received the calls at issue.

122. Reola was not in the market for life or final expense insurance at the time he received the calls at issue.

123. Defendant's conduct of calling Reola was harassing, annoying, and invaded Reola's right to privacy and seclusion.

124. Defendant's telemarketing activities also tied up Reola's phone line, caused Reola to waste time, diminish his phone's battery life and expend cell phone and internet data utilizing his answering service.

## DIRECT AND VICARIOUS LIABILITY

125. Without the benefit of discovery, because Defendant disclosed its identity, Reola assumes Defendant directly placed the calls.

126. However, if discovery reveals that some or all of the calls were made by third-party/parties on behalf of Defendant, then Defendant is vicariously liable for those calls.

127. On May 9, 2013, the FCC determined that this was not a basis for avoiding liability within a Declaratory Ruling that held that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies)

15

>would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

128. Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id*. at 6587 n. 107.

129. The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.,* at 6593.

130. If Defendant directly placed the calls at issue to Reola, Defendant is directly liable for those calls.

131. However, Defendant may have hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third-party telemarketers that are currently unknown to Reola and only known to Defendant.

132. In the event, Defendant's third-party telemarketers had actual and/or apparent authority to act on behalf of Defendant.

133. Likewise, Defendant also ratified its agents' violations of the TCPA by accepting leads and/or deriving profit from sales imitated by unlawful robocalls.

134. Defendant controlled or had the right to control the marketing activities of those acting on its behalf. Among other things, the calls received by Reola were similar in that they used a similar artificial voice script the live callers asked similar questions.

135. Defendant acted as a principal to telemarketing agent(s) whose identity or identities are unknown at this time.

136. Defendant is not permitted under the law to outsource and contract its way out of liability by directing and benefitting from its agents' TCPA violations.

137. For the counts identified below, if Defendant directly placed the call(s), it is directly liable. In the alternative, to the extent any call(s) were made by a third-party agent(s) acting on Defendant's behalf, Defendant is vicariously liable for those unlawful calls.

### Count I - Violations of the Telephone Consumer Protection Act ("TCPA") 47 U.S.C. § 227(b) *et seq.* (Artificial or Prerecorded Voice Calls)

138. Reola incorporates by reference the allegations of the previous paragraphs as if fully stated in this count.

139. The TCPA provides, in part:

> It shall be unlawful . . . (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone . . . .

47 U.S.C. § 227(b)(1)(A)(iii).

140. The TCPA also prohibits calls using an artificial or pre-recorded voice to "any residential telephone line" without prior express written consent. 47 U.S.C. § 227(b)(1)(B).

141. The TCPA defines a "telephone solicitation" as a "call or message for the purpose of encouraging the purchase of goods, or services which is transmitted to any person." 47 U.S.C. § 227(a)(4).

142. The Federal Communications Commission's regulations implementing the TCPA provide that telephone solicitations cannot be made to a recipient without the recipient's "prior express written consent." *See* FCC 12-21, CG Docket 02-278 (effective October 16, 2013); 47

C.F.R. § 64.1200(a)(2)

143. The term "prior express written consent" as defined by the Code of Federal Regulations means "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8)(i).

144. Reola did not provided Defendant and/or anyone acting on his behalf "prior express written consent" or any form of consent to place the calls at issue in this Complaint.

145. The TCPA provides for a private right of action and statutory damages of $500 per violation, and up to $1,500.00 per violation.  47 U.S.C. § 227(b)(3).

146. In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA of placing prerecorded or artificial voice calls without first obtaining prior express written consent to place such calls. *See* 47 U.S.C. § 227(b)(3).

147. By placing artificial or prerecorded voice calls to Reola, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. § 227(b) and the TCPA's corresponding regulations.

148. Defendant or those acting on its behalf willfully violated the TCPA when placing prerecorded voice calls to Reola.

149. Reola is entitled to damages of up to $500.00 per violation for each call made by Defendant or those acting on its behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that Defendant or those acting on its behalf willfully violated the TCPA.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff Joshua Reola requests that the Court enter judgment in his favor for all damages and other relief available under the TCPA, 47 U.S.C. § 227(b), including injunctive relief, statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA, for costs, any applicable pre-judgment or post-judgment interest amounts, and for any other relief that this Court deems just and proper.

**Count II - Violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c) *et seq.* (National DNC List Violations)**

150. Reola incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

151. The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receive more than one call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

152. The penalty for each call placed in violation of the TCPA's restrictions on calling phone numbers registered on the DNC List is up to $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

153. In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA's regulations prohibiting calls to phone numbers registered on the National Do-Not-Call Registry. *See* 47 U.S.C. §§ 227(c)(5)(A).

154. By making calls to Reola's phone number, which was registered on the DNC List, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. §§ 227(c)(1) and the TCPA's corresponding regulations.

155. Defendant or those acting on its behalf knew or should have known that Reola's phone number was registered on the DNC List at time it placed the calls at issue.

156. Defendant or those acting on its behalf willfully violated the TCPA when placing the calls to Reola's phone.

157. Reola is entitled to damages of up to $500.00 per violation for each call made by Defendant or those acting on its behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that Defendant or those acting on its behalf willfully violated the TCPA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Joshua Reola requests that the Court enter judgment in his favor for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief, statutory damages of up to $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA, for costs, any applicable pre-judgment or post-judgment interest amounts, and for any other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff Joshua Reola demands a jury trial.

Dated: January 22, 2026

THE WEITZ FIRM, LLC

/s/ Max S. Morgan
Max S. Morgan (PA ID 316096)
1515 Market Street #1100
Philadelphia, PA 19102
max.morgan@theweitzfirm.com
Tel: (267) 587-6240

*Attorneys for Plaintiff*